### CITY OF INDIANAPOLIS v. CONSUMERS' GAS TRUST CO. et al.

(Circuit Court of Appeals, Seventh Circuit. February 6, 1906.)

**1. CORPORATIONS—POWERS OF PUBLIC SERVICE CORPORATIONS—SALE OF PROPERTY.**

The rule that a public service corporation cannot without the assent of the Legislature, transfer its franchise and property to another, and thus disenable itself to perform its duties to the public, does not apply where the transfer is to the public, and a contract by a gas company made in accepting its franchise from a city giving the municipality the right to buy all of its property therein at appraised value is not ultra vires.

**2. MUNICIPAL CORPORATIONS—GRANT OF FRANCHISE—CONDITIONS.**

It is competent for a city in granting a franchise to a gas company to use its streets to make the grant terminable after a specified term or whenever after a stated number of years it shall elect to purchase the company's plant and property at an appraised valuation, and it is not beyond the power of the company to accept the franchise on such conditions, since its charter from the state gives it no right to exercise its functions within the city except on such terms as the city may impose.

**3. SAME—POWERS—PURCHASE OF NATURAL GAS PLANT.**

Statutory power given a city "to construct and establish gas works, or to regulate the establishment thereof" by others is broad enough to authorize the city to contract for the purchase of a natural gas distributing plant, and the construction of the term "gas works" is not to be narrowed by the fact that when the authority was granted, natural gas was not known to be a product available for use in the locality.

**4. SAME—OPTION TO PURCHASE GAS PLANT—VALIDITY.**

An option reserved by a city in the grant of a franchise to a gas company to purchase "the entire plant or plants" of the company at an appraised valuation is not defeated by the fact that the company had disposed of a portion of its property before the city sought to exercise it, but is enforceable as to the remaining property; nor can the right of the city to exercise such option be defeated on the ground that it intends to resell the plant or on the ground that it has no legal power to raise the money to pay for it, such matters being of no concern to the company or its stockholders.

Appeal from the Circuit Court of the United States for the District of Indiana.

The city of Indianapolis appeals from a final decree of the Circuit Court against the appellant, as one of the defendants in an ancillary bill filed by the appellee, Byron C. Quinby, who was complainant in an original suit, in the same court, against Consumers' Gas Trust Company and other defendants. In such original suit a final decree was entered in conformity with the prayer of the bill, which included the winding up of the corporation, and that decree was affirmed on appeal to this court. Consumers' Gas Trust Company et al. v. Quinby (C. C. A.) 137 Fed. 882. Upon the proceedings thereunder for sale of the corporate property, the city of Indianapolis asserted the right to become the exclusive purchaser, at a valuation to be fixed by appraisers, under a provision of the ordinance granting the Consumers' Gas Trust Company its privileges in the city. The ancillary bill sought injunctional relief against this claim and procedure thereunder, as casting a cloud upon the corporate title and preventing its sale in open market. The issues were heard upon the pleadings and stipulated facts. Aside from the special ordinance provision referred to and proceedings under it, the facts and circumstances out of which the present controversy arose, appear substantially in the statement which accompanies the opinion of the court on the former appeal above mentioned.

The ordinance adopted by the city of Indianapolis, June 27, 1887, authorized the use of streets for the purpose of supplying natural gas to the inhabitants, at prices named, upon acceptance of the ordinance by any corporation; and the Consumers' Gas Trust Company accepted such grant November 23, 1887, and entered upon the performance. The special provision of this ordinance in question reads as follows:

"Section 18. The city of Indianapolis shall have the right, by giving at least six months' notice, to purchase the entire plant or plants of any corporation, company, firm or individual accepting the provisions of this ordinance, at any time after the expiration of ten years from the date of its passage. The amount to be paid for such plant or plants shall be ascertained by the appointment of three disinterested persons, one to be appointed by said city and one by said corporation, company, firm or individual, and, in case of disagreement, two shall select a third. The amount thus fixed shall be paid by said city within six months after the amount to be paid for such plant or plants shall have been determined as herein provided."

The primary action on the part of the city to enforce this provision, occurred May 17, 1905, in the adoption of the following resolution:

"Be it resolved by the board of public works of the city of Indianapolis, That the Consumers' Gas Trust Company be given notice as provided by section 18 of the ordinance approved June 27, 1887, and accepted by said company, of the intention of said city to exercise its right to purchase the plant of said company."

Other facts bearing upon the issues are stated in the opinion.

See 140 Fed. 362.

Merrill Moores and Henry Warrum, for appellant.

Ferdinand Winters, for appellee.

Before GROSSCUP, SEAMAN, and KOHLSAAT, Circuit Judges.

SEAMAN, Circuit Judge. The issues which were in controversy under the original bill of the appellee, Quinby, were settled by the decree affirmed in Consummers' Gas Trust Co. v. Quinby (C. C. A.) 137 Fed. 882. With the fact conceded that the supply of natural gas was exhausted, so that the Consumers' Gas Trust Company was permanently incapable of furnishing such supply to the inhabitants of Indianapolis, the conclusions—(1) that the corporate franchise was limited and did not extend to other purposes which were contemplated; and (2) that the stockholders retained their property interests and were entitled to distribution of the assets—necessarily re-

sulted in the decree for winding up the corporation and disposing of its assets. The interesting questions which are now presented, under the ancillary bill, were in no sense involved in the former issues, and their solution does not rest on any matter thus adjudicated, unless the condition which arises from the resultant winding up of the corporation may enter into the consideration.

Upon this review all inquiry hinges ultimately on the validity or force, as between these contestants, of the option provision contained in section 18 of the ordinance under which the corporation obtained and exercised the franchise rights in the city of Indianapolis. The main contentions, in support of the relief sought in the ancillary bill and granted by the decree, are that the provision referred to was ultra vires both corporations—that is, that the gas company was without power to thus contract for a sale, and, in any view of the power of the other party to sell, the municipality was without power to purchase. In the opinion filed by the Circuit Judge who heard the case, the contention of ultra vires the incorporation of the gas company, is upheld; and, with no precedent directly in point, but in the light of the authorities cited, we recognize the force of the reasoning to that end. Both the question of power under its incorporation, and the right to raise it as the groundwork for the equitable relief sought, are inquiries of general interest in the line of municipal grants, and not free from difficulty, under the various lines of decision touching one and the other aspect; and one or both challenge solution at the threshold of the case.

The proposition stated, or necessarily implied, as premises for the argument, not only of want of power to give the option to the city, but of right in the corporation or its representative stockholder to equitable relief against its provisions, may be fairly summarized as follows: (1) The gas company derives its existence and powers as a corporation from the state, under the general legislative acts which conferred the authority to organize for the objects declared in the articles; and not from the city of Indianapolis. (2) The right to exercise its powers for the purpose for which it was incorporated—supplying natural gas to the inhabitants of Indianapolis by means of pipes within the city—is derived exclusively from the city, under delegation from the state, through the ordinance in question. (3) The gas company thus created and endowed became a quasi public corporation, as well recognized under the Indiana authorities, and subject to the general rule of that jurisdiction (and elsewhere as well), that no transfer can be made which disables such corporation from performance of its duties during the charter term, unless expressly authorized by the statute. (4) No express statutory authority appears for the option provision referred to, or the transfer contemplated by it. (5) The general statutes of the state then in force (Rev. St. 1881, § 3106, cl. 28; 2 Burns' Ann. St. 1901, § 3541) enabled cities "to construct or establish gas works, or to regulate the establishment thereof" by others; under the so-called special charter provisions, after 1891 and up to 1905 (2 Burns' Ann. St. 1901, § 3830) the city was empowered to purchase or erect and operate gas

works and "natural gas lines"; and, as amended in 1905 (Acts 1905, p. 279, c. 129, § 93, cl. 8) to purchase, etc., "gas works." (6) An act of March 7, 1887 (2 Burns' Ann. St. 1901, § 4306), authorized cities "to provide by ordinance, reasonable regulations for the safe supply," etc., "of natural gas within the respective limits." (7) The ordinance of June 27, 1887, which empowered and regulated the operations of this gas company, provided in section 18 that the city "shall have the right," upon notice, after the expiration of 10 years, "to purchase the entire plant or plants of any corporation" accepting thereunder at a price to be fixed by appraisers and paid by the city.

With all these premises in mind, is the established rule of Indiana against the voluntary transfer of its property by such public service corporation, violated by this option clause in the franchise ordinance? Otherwise stated, the inquiry in point must be, whether the doctrine of the authorities referred to is applicable, in any just sense, to the provision thus imposed by the city as one of the conditions of the privilege granted the gas company. For if it is so applicable, and the provision is treated as mere consent or participation on the part of the city to the transfer, no authority to transcend the corporate powers can be thus conferred. New Albany Waterworks v. Louisville Banking Co., 58 C. C. A. 576, 122 Fed. 776, 781. Examination of the numerous authorities cited for and against the contention of ultra vires reveals no case involving a provision of like character with this option clause, nor one in reference to a right to transfer the corporate property to a municipality under any circumstances. The general doctrine in all is thus comprehensively stated in the leading case of Central Transp. Co. v. Pullman's Car Co., 139 U. S. 24, 48, 11 Sup. Ct. 478, 484, 35 L. Ed. 55:

"A corporation cannot, without the assent of the Legislature, transfer its franchise to another corporation, and abnegate the performance of the duties to the public, imposed upon it by its charter as the consideration for the grant of its franchise. Neither the grant of a franchise to transport passengers, nor a general authority to sell and dispose of property, empowers the grantee, while it continues to exist as a corporation, to sell or to lease its entire property and franchise to another corporation."

In none of the citations, state or general, are there any reasons stated that seem inconsistent with the proposition that a corporation, engaged in a service of public utility, may contract for a sale to the municipality of all its property therein, either through a condition accepted in the franchise from the city, or through subsequent arrangement. The question whether municipal ownership is favorable to the public interest, is neither involved in, nor open to judicial inquiry. Assuming that such ownership is authorized, and is contemplated or demanded by the municipality, we are convinced that this proviso, treated alone as a contract of sale on the part of the gas company, is not within the inhibition of the rule—not ultra vires. The public policy which is mentioned in the cases cited, as opposed to an implication of charter power to turn over its property to another and "abnegate the performance of its duties to the public," has no application to the transfer to the public—the municipality—of property used in public service.

We are of opinion, however, that the rule 'in question is inapplicable to the provisions of section 18 of this ordinance for another reason, and that it is unnecessary to rest upon the foregoing view, the competency of the gas company to accept the terms thus imposed as a condition of the franchise grant. Voluntary transfers of the corporate franchise, or of all the corporate property to effect that result, are alone within the meaning of the rule; not a transfer which becomes necessary through the expiration of a charter or franchise rights, or which may be enforced under judicial proceedings, or for like involuntary causes. The nature of this provision, read in the light of the entire ordinance, and in its essence, as we believe, is one of limitation on the franchise granted by the city, at the election of the city—the city being the source of the grant—with the just condition, that upon the exercise of the option, the city shall take over and pay for the plant put in under such grant, at an appraised valuation; and is not one of voluntary bargain and sale contemplated by the rule. The validity of the ordinance terms is to be tested by the rights and attitude of the city in imposing the conditions for the grant of privileges to the accepting corporation, together with the rights and attitude of the gas company under its incorporation, and the provisions of section 18 must be interpreted in like view. While the incorporated gas company was the creature of the state, with its being and inherent powers derived alone from the state enactments, and referable to no other source, it is alike unquestionable that such incorporation conferred no power to exercise the purposes declared in the organization for supplying gas within the city of Indianapolis, except as expressly authorized by the municipality. The city being the source of the grant, not merely a consentor to it, the terms and duration of the grant to that end were prerogatives of the city, delegated by the state, and the gas company was powerless, equally with any individual, to exact terms or privileges. It could only accept or refuse such terms as were tendered. The authority of the municipality in that behalf is well settled (City of Indianapolis v. Consumers' Gas Trust Co., 140 Ind. 107, 114, 39 N. E. 433, 27 L. R. A. 514, 49 Am. St. Rep. 183; Westfield Gas & Milling Co. v. Mendenhall, 142 Ind. 538, 543, 41 N. E. 1033), and its ordinance prescribing terms, accepted by the corporation seeking entrance, is binding upon both parties. Thus in fixing by this ordinance the tenure during which the grantee was permitted to occupy the streets with its pipes and serve the inhabitants with natural gas, it was within the power of the city to limit the tenure, either to a definite number of years, or to terminate after a given period, at the option of the city, as was in effect provided by section 18. When the ordinance was accepted, the right to exercise its corporate purposes within the city was subject to the limitation—free for the 10 years, but terminated thereafter, if the city so elected and paid the appraised value of the plant. No right obtained or duty assumed under the incorporation is alienated or taken away by the provision. When it is thus terminated at the end of the period of absolute license, and its property is paid for, the corporation is deprived of no right or power which came from the state.

As it was without right to exercise its functions in the city, without the grant from the city, so the end of that grant merely leaves the corporation in its original plight—having a charter but no right in the streets for its exercise. Its power to accept and operate under another grant, which is the utmost of its charter rights, has suffered no diminution.

The fact that the election of the city terminates the grant, instead of a fixed period, say of 10 years, cannot be material to the present inquiry, namely, whether the corporation is bound by the acceptance of one or the other form of limitation. With the expiration of the term at any period named, the gas company could neither exercise its corporate functions, nor could a purchaser of its property obtain the right to use it in the city, unless so empowered by the city. The provision for purchasing the corporate property, when it is no longer available to the corporation for serving the public and cannot be made available without renewal of the city franchise, we believe to be incidental only to the purpose of limiting the grant—as an equitable arrangement to save the grantee from sacrifice of the property thus made useless by the expiration of the license and to preserve it for future public use. With or without this stipulation for sale, the corporation was powerless to enter upon the performance of its corporate objects unless it accepted the limitation of term thus imposed. We are satisfied that the acceptance and entry thereunder cannot operate to turn the necessary withdrawal at the end of the term into the voluntary renunciation of public duties denounced by the law, and that this sale provided for in such event is equally free from invalidity. Summarizing the view stated—and conceding that the validity of the provision in the ordinance must be ascertained in the light of the conditions then existing and not with reference to the present disability of the company to perform service, owing to cessation of the supply of natural gas—the incorporation vested no public service powers or duties, until it became operative to that end, through the grant of the city and the acceptance by the grantee. Without such grant it was impotent for any service, public or private. The terms of the grant for the contemplated public service in the city, were fixed alone by the ordinance, under legislative authorization. Its acceptance with the proviso of section 18, involved no existing power or obligation, but became the measure of both for the public service thus undertaken, so that no infringement of state rule or policy arose. Moreover, the limitation and provision in the ordinance must be presumed to be adopted in the public interest, and were the interpretation upholding its validity fairly open to question, "the doubt must be solved in favor of the city, because public contracts should be construed, not contra proferentem, but liberally in favor of the public." Muncie Natural Gas Co. v. City of Muncie, 160 Ind. 97, 112, 66 N. E. 436, 60 L. R. A. 822, and cases cited.

The contention, therefore, that in the acceptance of the provisions of section 18, the gas company exceeded its charter powers, is overruled, without reference to the further question, whether that issue can be raised in the present controversy. The right of the city to

take over the property in suit, however, is challenged upon several grounds, as without either power to make the intended purchase, or equitable standing for its enforcement. These contentions, as classified in the argument, are in substance: (1) The city was not empowered, when the ordinance was adopted and is not now empowered, either to purchase as contemplated by the provision, or to "go into natural gas business"; (2) the delegation of power to fix the purchase price was unauthorized; (3) the option applies only to the entire plant, and must be exercised while the plant remains intact; (4) the option can be exercised only for operation of the plant by the city and not for sale to other parties; (5) without means appropriated to pay for the plant, no power exists to contract for the purchase; (6) the city is barred by the adjudication under the original bill. We have considered each, with the authorities cited in support of the argument, and believe that no substantial ground is furnished under either to sustain the bill or decree.

1. The want of general power in the municipality to make the purchase, is thus stated in the first proposition of the appellee's brief upon the point:

"The real question is not whether the city had power to construct a natural gas plant, or to buy a natural gas plant, but whether the city was empowered to make a contract with a gas company, whereby the gas company was disabled to continue its business under the charter."

This involves, in effect, the same question which has been considered upon the inquiry whether the provision was ultra vires the gas company charter, and no further discussion in that view is deemed needful. Nevertheless, it is further contended that the powers granted the city, under the several enactments which are above referred to, are not applicable to the purchase of a natural gas plant, or to the operation of such plant by the municipality. At the date of this ordinance, it is unquestionable that charter powers existed for ownership of certain public utilities, including the power "to construct and establish gas works, or to regulate the establishment thereof by" others; and that a general statute conferred power on municipalities "to provide by ordinance reasonable regulations for the safe supply," etc., of natural gas. We are convinced that the first-mentioned charter provision was broad enough to authorize the purchase, by implication at least, under the well settled rule, exemplified in City of Crawfordsville v. Braden, 130 Ind. 149, 154, 28 N. E. 849, 14 L. R. A. 268, 30 Am. St. Rep. 214, and Lake County Water & Light Co. v. Walsh, 160 Ind. 32, 43, 65 N. E. 530, 98 Am. St. Rep. 264, without reference to the force of the general act of March 7, 1887, or the construction applied under it in City of Noblesville v. Noblesville Gas Co., 157 Ind. 162, 166, 60 N. E. 1032, and prior cases. The suggestion that natural gas was not known or recognized as an Indiana product available for such uses, when this charter power was granted by the Legislature, cannot serve to narrow the interpretations of the term "gas works" to the means and methods then known, excluding the developments and improvements which attend all progress. Magee v. Overshiner, 150 Ind. 127, 129, 49 N. E. 951, 40 L. R. A. 370, 65 Am. St. Rep. 358.

2. The provision for an appraisment to fix the value of the property on the exercise of the option is in no sense a delegation of municipal power, for surely no power is vested in the city to take property for public uses at a valuation fixed by itself.

3. While it is true that the option provides for purchasing "the entire plant or plants," so that the city could not exercise the option for one portion and exclude another which remained in the hands of the gas company, nevertheless, the option is plainly enforceable for the property which constitutes the remaining plant, notwithstanding portions have been sold by or on behalf of the company. Otherwise it could rest with the seller alone to defeat the contract rights.

4 and 5. The objection that the city intends to sell the plant to other parties, instead of operating with it as a municipality, is without force. The use which may be made of the option by the city does not concern the company (National Waterworks Co. v. Kansas City, 10 C. C. A. 653, 664, 62 Fed. 853, 965 [27 L. R. A. 827]); and in any view the option is assignable (De Motte v. City of Valparaiso, 161 Ind. 319, 67 N. E. 985, 66 L. R. A. 117). The objection that the city has not appropriated means for the purchase and is unable to raise the necessary amount, is untenable for like reason. The company is sufficiently protected by the provision which requires payment of the appraised value as a condition of sale.

6. In answer to the final objection, that the adjudication under the original bill (wherein the city was brought in as an additional party) bars the right to exercise this option, the remark is sufficient that the present issue was in no sense involved under the allegation of that bill, nor was it germane to any issue there presented.

GROSSCUP, Circuit Judge (concurring). Two questions alone, are raised by the case, viz.: Did the city have power to reserve the option whereby, at the end of the 10 years, it could take over the mains and pipes involved, for its own municipal gas purposes? And did the company have power, under the situation existing, to give such option? All the other questions raised are such as only the Attorney General, or some one representing the public, can raise. They cannot be raised by the stockholders of the company.

The city had power, at the time the option was taken, to construct and establish gas works. This included power to operate gas works. And power to establish and operate, must include also the power to purchase mains and pipes; and it does not seem to me that this power can be affected by the fact whether such mains and pipes are already in the ground or are on top of the ground. Indeed, were the mains and pipes included in the option, the mains and pipes of a pre-existing artificial gas company, no question I think would be raised.

But it is said that the city was without power to contract prospectively for these particular mains and pipes, because the city was without power, under the Indiana statutes, to then construct or operate natural gas plants, and these mains and pipes were, at the time the contract was made, a part of a natural gas system; that the city had in mind at the time the contract was made a municipal natural gas system,

and having no power to construct or operate such a system, was without power to take this option.

The argument does not seem to me to be in point. The thing enjoined by the court below was not the construction or operation of a municipal natural gas plant. The thing enjoined was the purchase of dead mains and pipes—a purchase in the promotion of a purpose to construct and establish works that would distribute artificial gas—just such a public work as the statutes admittedly allow. The mains and pipes covered by the option, though intended possibly at the time for natural gas distribution, were not indissolubly connected, for all time, with the distribution of natural gas. At no time were these mains and pipes anything else than a mechanical means to a specific end; at the time they were laid, to the distribution of natural gas; at the present time, to the distribution of artificial gas; and it cannot be said that because the city was not permitted to use these mains to distribute natural gas, it may not be permitted to use them in the distribution of artificial gas. It is not the purpose of the then option that controls. The consideration that controls is the actual use to which the option is now to be put. No one would say, for instance, that mains and pipes lying on top of the ground, purchased by the city 10 years ago, to be put into a municipal natural gas plant, may not be used now in the construction and establishment of an artificial gas plant. And the fact that the subject-matter of the option are mains and pipes in the ground, does not differentiate their purchasability for admittedly permissible purposes, from mains and pipes upon the ground. The option ran to the city for any use to which it might thereafter be lawfully devoted, and to that extent was within the power of the city to take, and is within the power of the city to exercise.

Assuming, then, that the city had power to take the option, the question recurs, had the company power to give the option, and is it required to perform the option? Of this I have no doubt. The sole right of the company to enter upon the streets of Indianapolis, was under a grant from the city of Indianapolis. Under the laws of Indiana, the city is not simply a consentor—the city is the source of the grant; and being the source of the grant, had the right to impose upon the grant, as to tenure, as well as to other terms and conditions, just such limitations as it deemed wise. The grant could unquestionably have been made for 20 years straight; the grant, without question, could have been made for 10 years straight; or the city could have made the grant run for 20 years, determinable at the end of 10 years upon conditions named. And the acceptance of such grant, whether the tenure was a fixed one or a shifting one, measured the right of the company just as fully as would have been the acceptance of a 20-year grant.

Now the grant in question was for 20 years, determinable at the option of the city in 10 years. That option being exercised, the grant was at an end. Thereafter the company had no further rights in the streets. Its grant to the streets had ceased. It had come, as a practical public utility corporation, by the very law of its life to the end of

its life. Plainly, then, in laying down its life at the end of its life, it was not surrendering contrary to the public will, and it could not have been contemplated from the beginning as surrendering contrary to the public will, its public functions. Indeed, in the performance of this option by the company, instead of a surrender of duty to the public, there was compliance by the company with the contract made with the public—the company's contract that it would cease its public functions upon the conditions named; for in exacting this option, the city lawfully represented the public will, just as much so as under other given circumstances, the standing legal rule against voluntary surrender represents the public will.

We are of opinion that the ancillary bill on which the decree was entered is without equity, and the decree is reversed, with direction to dismiss the ancillary bill accordingly.